IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2007

## SEAN WILLIAMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-28195     John P. Colton, Judge**

_____

**No. W2006-00640-CCA-R3-PC  - Filed November 16, 2007**

_____

The petitioner, Sean Williams, was convicted of first degree (premeditated) murder and sentenced to life imprisonment. He filed a petition for post-conviction relief and alleged that he received ineffective assistance of counsel at trial, which was denied by the post-conviction court following a hearing. On appeal, he contends that the post-conviction court erred in denying his petition and specifically contends that trial counsel was ineffective for failing to secure a jury instruction for facilitation. After review, we conclude that trial counsel was not ineffective, and we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

John H. Parker, II, Memphis, Tennessee, for the appellant, Sean Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Muriel Conner and Dennis Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This court summarized the facts of the case during the petitioner's direct appeal as follows:

Orlando Gates, the sixteen-year-old victim, died from multiple gunshot wounds inflicted on January 11, 1999. In 1998, Gates and the defendant, Edward Coleman, were involved in an automobile accident, in which Coleman lost one of his legs. Sid Rhodes, a co-defendant, testified that while he was visiting Coleman in the hospital following the accident, Coleman said, "I'm going to kill him," referring to Gates. Ocassieo Johnson, a friend of the defendants, testified Coleman once said he

wanted to get someone to "jump" Gates.  Johnson also testified the defendant, Sean Williams, once said he wanted to shoot Gates due to the injury to Coleman's leg.

Around 8:00 p.m. on January 11, 1999, Williams picked up Coleman, Rhodes, and Mario Means in a stolen Nissan Altima.  Coleman removed a .25 automatic pistol from the trunk of the car.  Both Johnson and George Gates, the victim's brother, testified they saw Coleman with the gun earlier in the day.  Rhodes testified that when they entered the car, Williams asked, "Do you know what we fixin' to do?"  When Rhodes indicated he did not know, Williams answered, "We fixin' to kill him."  When Rhodes asked who they intended to kill, Williams answered, "Orlando Gates."

Williams, Coleman, Rhodes, and Means then went to Williams' house, and Williams asked Rhodes to get the victim, who was inside the house.  When Rhodes knocked on the door, Gates came out of the house.  Gates got into the car, and Rhodes went inside Williams' house.  Gates then came back inside Williams' house and told Rhodes "Come on, we're leaving."  Rhodes then got into the car with Williams, Coleman, Means, and Gates.

Means testified that while Rhodes was inside Williams' house, Williams and Coleman began to whisper to each other.  Williams asked, "Do they know what we fixin' to do?"  Coleman said, "No."  Williams then asked, "Do they know we fixin' to kill him?"  Williams and Coleman then laughed.

Williams was driving the Altima, and Coleman sat in the front passenger seat.  Rhodes, Means, and Gates sat in the back seat with Gates sitting between Rhodes and Means.  Williams drove to the "waterfall," an isolated, wooded area at the south end of Prospect Street in Memphis.

When they arrived at the "waterfall," Williams pulled the car into a ditch and told everyone to get out because the car was stuck.  Rhodes and Means testified they all tried to push the car, but Williams had his foot on the brake.  Means told Williams to get his foot off the brake, and when he did, they pushed the car up the hill.

Rhodes testified that Coleman then cocked his pistol and fired three shots at Gates, who fell to the ground.  Rhodes testified Williams took the gun from Coleman and shot Gates in the head, and Gates stopped moving.

Rhodes and Means testified that after Williams shot the victim, he told them to shoot Gates, and if they did not, he would kill them.  Rhodes testified Williams gave the gun to Means, who shot the gun once toward Gates.  Rhodes testified that after Means shot the gun, Means gave it to Rhodes, who fired two shots beside Gates' body.  Coleman said Gates was not dead, so Williams took the gun from

Rhodes and shot Gates once more in the head. Acting upon Coleman's instructions, Williams hid the victim's body in the bushes.

Means, however, testified Coleman first shot Gates several times. Williams then took the gun and threatened Means and Rhodes with it. Means further testified he took the gun, held it behind his back, and shot the gun once without hitting Gates. Williams and Coleman laughed at Means for missing Gates, and Means ran back to the car. Means testified Williams then shot Gates twice in the head, but Rhodes never shot Gates. When Williams got into the car, Means asked him if he shot Gates in the head. Williams responded, "Where you think I shot him at, his ear?"

Coleman, Williams, Means, and Rhodes then drove to Williams' house. Johnson testified he saw the Altima coming down Prospect Street, but because the windows were tinted, he could not see who was inside the car. Johnson followed the car to a parking lot near Williams' house. While standing in the front yard, Williams' mother yelled, "If I go up there and anything is wrong with that boy, everybody that was in the car is going to jail." Coleman then told Johnson to take the car out of the neighborhood, so Johnson left with the car. Means went home and Coleman, Williams, and Rhodes went inside Williams' house. Rhodes testified Williams' mother asked, "Why you do it?"; no one responded.

Tiffany Pride, a neighbor, testified Williams came to her house on the night of January 11th looking for his grandmother. She testified Williams looked scared and had spots of blood on his clothes. She said she overheard Williams tell his grandmother he needed her to wash some of his clothes.

Johnson testified he called Coleman on January 12th, and Coleman said he shot Gates at the "waterfall" the previous day.

Rhodes and Means were charged with facilitation of first degree murder and were not tried with Coleman and Williams. A jury found Coleman and Williams guilty of premeditated murder, murder in perpetration of kidnapping, especially aggravated kidnapping, and aggravated kidnapping. The trial court merged the premeditated first degree murders and felony murders into a single conviction and further merged the especially aggravated kidnapping convictions and aggravated kidnapping convictions into a single conviction.

State v. Edward Coleman and Sean Williams, No. W2001-010201-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 965, **3-7 (Tenn. Crim. App., at Jackson, Nov. 7, 2002).

During the post-conviction hearing, the petitioner was the first witness to testify. He said that trial counsel never tried to prove that he was not present during the shooting; instead, counsel focused on attacking the inconsistencies and credibility of the other witnesses statements. The petitioner testified that his trial counsel argued that the State's witnesses could not be believed. He

said he provided the names of two alibi witnesses to counsel, but they were never called. The proposed witnesses were his mother and the mother of his child. He acknowledged that his mother had a drug problem and that she could not be found at either the time of trial or the post-conviction hearing. He was also unable to locate the mother of his child for the post-conviction hearing.

During cross-examination, the petitioner acknowledged that counsel cross-examined the State's witnesses and tried to impeach them with their inconsistent statements, going so far as to ask them their motivation to lie and implicate the petitioner. He also acknowledged that counsel had concerns about his mother's credibility and may have advised him against calling her as a witness. Counsel also advised him against calling the mother of his child because she was a minor at the time she became pregnant and would have been proof he had committed a crime.

Next, trial counsel testified that he determined, after much discussion with the petitioner, that the best defense strategy would be to attack the credibility of the State's witnesses. He testified that he did everything possible to discredit the State's witnesses by showing their motivation to lie and by impeaching them with their own inconsistent statements. He acknowledged that he advised the petitioner against calling the mother of the petitioner's child as a witness because he feared it would bring a confession of statutory rape and would also present credibility issues. He was unable to locate the petitioner's mother prior to trial and was also concerned about her drug problem and credibility.

Counsel said he did not request any instructions on lesser included offenses because he was arguing that the petitioner was not present or involved in the crime. He did not want to lose credibility with the jury by arguing multiple theories and, at the same time, acknowledging the petitioner's involvement. During cross-examination, he testified that he did not argue or request a facilitation instruction because he did not think it was in the petitioner's best interest. He said he did not think a rational jury would convict the petitioner of facilitation. It came down to whether they believed his argument that the petitioner was not involved or present during the shooting or agreed with the State that the petitioner was guilty as charged.

Analysis

On appeal, the petitioner argues that trial counsel was ineffective and specifically contends that counsel did not properly investigate and prepare for trial and, as a result, "employed a defective trial strategy" that did not request appropriate jury instructions. The State contends that the record does not support the petitioner's claim.

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses,

the weight and value to be afforded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Moreover, if a petitioner makes an insufficient showing of either prong, we need not address both. Goad, 938 S.W.2d at 370. A reviewing court will not use the benefit of hindsight to second-guess a trial counsel's strategy or criticize tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel's alleged deficiencies should be judged at the time they were made in light of all the facts and circumstances. See Strickland, 466 U.S. at 690.

The petitioner argues that counsel should have requested jury instructions on the lesser included offenses of first degree murder, specifically facilitation. To support his argument, he cites the post-conviction court's finding that the trial court should have given instructions on second degree murder, reckless homicide, and criminally negligent homicide. The post-conviction court found the omission of the jury instructions was harmless error, and the petitioner contends that this conclusion was improper.

The trial court has a duty to instruct the jury on any lesser included offenses of the charged offense when such instruction is supported by the evidence, regardless of whether the petitioner has requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser included offenses is de novo with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002).

If an offense is found to be a lesser included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser included offense. Bowles, 52 S.W.3d at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser included offense. Burns, 6 S.W.3d at 469. The court must view the evidence liberally, in a light most favorable to the existence of the lesser included offense, without

judging its credibility.  State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser included offense.  Burns, 6 S.W.3d at 469.

The evidence, not the theories of the parties, determines whether an instruction on a lesser included offense should be given.  State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002).  Furthermore, the decision to convict on a lesser included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted."  Id. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense.  Burns, 6 S.W.3d at 472.

Harmless error, relating to the failure to charge lesser included offenses, must be shown "beyond a reasonable doubt."  Ely, 48 S.W.3d at 727.  The proper inquiry is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial."  Allen, 69 S.W.3d at 191.  In making the harmless error determination, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury."  Id.

> In sum, when a reviewing court determines whether a lesser-included offense ought to be charged, the evidence clearly controls.  If there is evidence sufficient to support a conviction for a lesser-included offense, we hold that a trial court must charge that offense.  The determinative test being whether there is evidence sufficient such that a jury *could* convict on that lesser-included offense.  If a jury could convict, no matter how improbable, it is error not to charge that lesser-included offense. However, in deciding whether it was harmless beyond a reasonable doubt not to charge a lesser-included offense, the reviewing court must determine whether a reasonable jury *would* have convicted the defendant of the lesser-included offense instead of the charged offense.  In other words, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offense did not affect the outcome of the trial.  Allen, 69 S.W.3d at 191.

State v. Richmond, 90 S.W.3d 648, 662 (Tenn. 2002) (emphasis in original).

Counsel testified that he and the petitioner determined their defense was that the petitioner was not present during the shooting.  As a result, they attempted to attack the credibility of the State's witnesses.  The petitioner acknowledged that their trial strategy revolved around him having no involvement in the crime.  Therefore, counsel did not request instructions on lesser included offenses because it was not in the petitioner's best interest to argue several alternative theories. Based on the proof presented at trial and the agreed upon trial strategy, counsel made the tactical decision not to request lesser included offenses.

The State cites a recent decision, Jimmy Ray Cureton v. State, No. E2005-02491-CCA-R3-PC, 2006 Tenn. Crim. App. LEXIS 693, at *9 (Tenn. Crim. App. Sept. 14, 2006, at Knoxville), perm. to appeal denied (Tenn. Dec. 18, 2006), where this court affirmed a similar tactical decision

by counsel in which he did not request a facilitation charge because he believed it would weaken the ability to claim that the client was not present at the time of the crime. This court concluded that trial counsel made a strategic decision not to request a lesser included offense and declined to second-guess the decision. Likewise, we will not re-evaluate counsel's strategic decision against requesting the proposed jury instructions, and we conclude that counsel was not ineffective for pursuing the particular course he took in his representation of the petitioner. The petitioner has not met his burden of showing that counsel was deficient in his representation.

Next, we acknowledge that, at the time of the petitioner's trial, the trial court had a duty to instruct the jury on any lesser included offenses supported by the evidence, regardless of whether the petitioner requested such an instruction. See Bowles, 52 S.W.3d at 74, and Burns, 6 S.W.3d at 464. The petitioner states in his brief that the jury was instructed on the lesser included offense of second degree murder but was not instructed on facilitation of either offense. The State submits and we agree that, based on the presented appellate record, we are unable to conduct a proper review to determine whether the evidence supports an instruction on the requested lesser included offenses in spite of the trial court's duty.

The record on appeal does not include a copy of the trial transcripts, and they were not introduced as an exhibit during the post-conviction hearing. It is well settled that an appellant has a duty to prepare a record that conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). When the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, this court cannot consider the merits of the issue. Id. at 560-61. See also Tenn. R. App. P. 24(b). The petitioner refers to the trial record in his brief but did not take steps to include it as part of the record on appeal. Because we cannot review the trial transcript, we cannot determine if the petitioner's trial was prejudiced by trial counsel's errors as alleged and, therefore, the issues must be deemed as waived. Based on the limited record before us, we find nothing to conclude that the petitioner was anything less than a leader in the commission of the murder and, therefore, an instruction on the lesser included offense of facilitation was not warranted.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE